IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| AXIOM IMPRESSIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-cv-00453-NKL |
| | ) | |
| SELECTIVE INSURANCE COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Defendant Selective Insurance Company of America ("Selective") moves for summary judgment with respect to all claims brought by plaintiff Axiom Impressions, LLC ("Axiom"). Doc. 34. The dispute arises from a fire that occurred at a facility that Axiom owns and that Selective had insured. After the fire, with Selective's approval, Axiom utilized its own labor force to fix damaged equipment, at a purported cost of approximately $600,000. Selective has already reimbursed Axiom for certain labor costs. The question before the Court is whether Axiom has been fully compensated for the labor it devoted to the repairs in accordance with the insurance policy, and if so, whether quasi-contract principles may require Selective to pay Axiom more than it already has for that labor.

For the reasons discussed below, the Court grants summary judgment in favor of Selective on all counts.

I. **Background**

Axiom provides offset printing and support services at three facilities, one in each of three states: Missouri, Tennessee, and Arkansas. Axiom's main office is in Missouri.

1

An explosion and fire erupted at the Missouri location on February 15, 2019, damaging the facility and Axiom's equipment.

### A. The Policy

At the time of the fire, Axiom had a Commercial Output Program insurance policy (the "Policy") with Selective. Axiom filed a claim under the Policy, and Selective accepted the claim as a covered loss.

The dispute at issue concerns coverage under the Policy's Property Coverage Part and Income Coverage Part.

The Policy's Property Coverage Part defines Covered Business Personal Property, in relevant part, as: "'your' business personal property in buildings or structures at a 'covered location' . . . ." Doc. 36-2, p. 87. The Property Coverage Part also includes a LOSS PAYMENT provision:

1. Our Options – In the event of loss covered by this coverage form, "we" have the following options:

    a. Pay the value of the lost or damaged property;
    b. Pay the cost of repairing or replacing the lost or damaged property;
    c. Rebuild, repair, or replace the property with other property of equivalent kind and quality, to the extent practicable, within a reasonable time; or
    d. Take all or any part of the property at the agreed or appraised value.

*Id.* p. 104.

The Income Coverage Part provides for Earnings and Extra Expense. *Id.* p. 107. It appears that only the Extra Expense provision is relevant to this dispute. *Id*. That provision states:

> "We" cover only the extra expenses that are necessary during the "restoration period" that "you" would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a covered peril.

> "We" cover any extra expense to avoid or reduce the interruption of "business" and continue operating at a "covered location," replacement location, or a temporary location. This includes expenses to relocate and costs to outfit and operate a replacement or temporary location.
>
> "We" will also cover any extra expense to reduce the interruption of "business" if it is not possible for "you" to continue operating during the "restoration period."
>
> To the extent that they reduce a loss otherwise payable under this Coverage Part, "we" will cover any extra expenses to: 1. Repair, replace, or restore any property.

*Id.*

The Policy's "HOW MUCH WE PAY PROVISION" states: "If more than one coverage of this policy insures the same loss, 'we' pay no more than the actual claim, loss, or damage sustained." *Id.* at 104.

### B. The February 20, 2019 Meeting Between Axiom and Selective

On February 20, 2019, a Selective adjuster, Heath Howell, traveled to the Missouri location to inspect it. Axiom's CEO Matthew Duffield, CFO Chris Mikuls, and COO Kevin Hendrix met with him.

Axiom CEO Mr. Duffield suggested using Axiom's Missouri labor force to repair its damaged equipment because they would "not be able to find enough labor in the country, in the US, to get them here in time to get this equipment fixed, and it will -- so it will delay and cost a significant amount more." Selective's Mr. Howell agreed that the proposal was the best or most expeditious way to proceed.[1] Axiom CFO Mr. Mikuls asked Mr. Howell to confirm that Selective would reimburse or pay Axiom "directly" for the repairs with the appropriate documentation. Mr.

---

[1] The Court must view the facts in the light most favorable to the non-movant. *Higgins v. Union Pac. R.R. Co.*, 931 F.3d 664, 669 (8th Cir. 2019) (quotation marks and citation omitted).

Howell answered in the affirmative. Specifically, according to Mr. Hendricks, Mr. Howell said that Selective would "pay[] Axiom for the labor versus paying outside services." Mr. Mikuls wrote in his notes, under the heading, "additional costs," "all production labor in Missouri 2/15 and forward." Mr. Mikuls later said of the exchange, "when we discussed this on February 20th, to me, that's a promise . . . ." Mikuls Depo. Tr. 44:5-20. However, there is no evidence that anybody at the February 20th meeting discussed the hourly rate that Axiom would charge Selective for labor for the repairs, nor did anyone specify which provision of the Policy would be used to cover the repair labor costs, nor was there any agreement that those costs were to be paid separate from or outside of the Policy.[2]

Indeed, Mr. Duffield said that he did not recall going into specifics regarding the "different buckets of costs associated with the claim" in that meeting. He explained, "I knew it was going to be a difficult time and didn't want to lose customers because I didn't have the capacity to do so. So I wasn't as concerned about which bucket was going to be charged. I wanted to make sure we were going to get paid and we were communicating with our insurance provider." Duffield Depo. Tr. 30:4-17. Mr. Hendrix's recollection was similar. *See* Doc. 36-4, Hendrix Depo. Tr. 31:18-3 (Q. And it's fair to say that you don't remember any discussion about timing of payment when you met with Mr. Howell in the conference room on September -- on February 20th, 2019? A. What I remember about that was Chris talking about a need of cash immediately and Heath making a comment about, you know, getting an initial payment. And it wasn't -- it wasn't in a particular

---

[2] Mr. Duffield generally recalled speaking with someone at Axiom later about hourly rates, specifically, "the fact that it was probably some $20 to $25 an hour fully burdened cost [for Axiom to perform the repairs] versus outside labor of 75 to 100." Doc. 36-3, Duffield Depo Tr. 26:7-23. There is no dispute that Mr. Duffield discussed using Axiom's labor with other Selective agents, including Casandra Arenz, at a later time. However, there is no indication that Selective agreed to reimburse Axiom at any particular rate or rates.

bucket of labor, parts, services, or anything like that. It was just cash needed to operate the business.").

### C. The Repairs

Axiom began the necessary repairs after the February 20th meeting with Mr. Howell. Mr. Mikuls, Axiom's CFO, sent reimbursement requests to Selective on a weekly basis and periodically received statements of loss with validation reports in return. Mikuls Depo. Tr., 40:24-42:6. However, after a March 6, 2019 email from Mr. Mikuls to Mr. Howell sought a payment of approximately $600,000, Mr. Howell responded that the request would be reviewed, and a disagreement subsequently arose about how labor costs would be paid pursuant to the Policy.

By April 11, 2019, Mr. Duffield knew that Axiom and Selective disagreed as to how Axiom would be paid for the labor it devoted to repairs. However, at that point, Mr. Duffield felt that using a third-party to complete the repairs would delay completion of the repairs by several months. Axiom therefore pressed on with the repairs with its own labor. Axiom completed the repairs in June 2019.

### D. Production Despite the Fire

While the Missouri facility was out of commission, Axiom shifted production to its Tennessee and Arkansas facilities to complete its contracts.

Axiom did not lose any revenue, sales, or customers as a result of the fire.

### E. Payouts

In total, Selective has paid Axiom $4,241,222.47 for the claim relating to the February 2019 fire, including $946,233.01 under a provision covering buildings, $2,564,562.34 under the Property Coverage Part, and $728,827.48 under the Extra Expense provision for, among other

5

things, the extra costs associated with shifting production from Missouri to Arkansas and Tennessee. There is no dispute that Selective paid Axiom for those extra expenses.

To calculate excess labor costs, Selective compared projected loss period wages (its calculation of the labor costs that Axiom would have incurred if the fire had not occurred) with loss period wages (the labor costs that Axiom actually incurred after the fire). The difference between the projected labor costs and actual labor costs constituted the excess labor costs. For Arkansas, by Selective's calculation, the projected loss period wages totaled $508,674.87. The actual loss period wages for Arkansas were $824,606.66. Thus, Axiom incurred $315,931.79 in additional labor expenses in Arkansas because of the fire. In Tennessee, by Selective's calculation, the projected loss period wages totaled $550,344.48 and the actual loss period wages totaled $627,596.86. Thus, Axiom incurred $77,252.38 in additional labor expenses in Tennessee because of the fire. The actual loss period wages were significantly higher than the projected loss period wages in Tennessee and Arkansas because of the shift in production to those locations after the fire.

In Missouri, by Selective's calculation, the projected loss period wages were $901,689.84, and the actual loss period wages were $850,779.36. The $850,779.36 paid at the Missouri location included the labor costs directly related to repairing the fire-damaged equipment. Axiom incurred $50,910.48 less in actual loss period wages in Missouri, even though it spent $600,000 in labor costs to repair the equipment damaged in the fire.

To compensate Axiom after the fire, Selective (1) took the "excess" wages that Axiom incurred in Tennessee and Arkansas during the loss period ($77,252.38 and $315,931.79 respectively, totaling $393,184.17), and (2) set them off against the decrease in wages from Missouri ($50,910.48). Selective paid the excess labor costs of $342,273.69 ($393,184.17 minus

6

$50,910.48) to Axiom under the Extra Expense provision. The chart below sets forth the relevant figures:

| Axiom's Excess Labor Costs at Each Location | | | |
|---|---|---|---|
| **Axiom Facility** | **Projected Labor Costs (Without Loss)** | **Actual Labor Costs (With Loss)** | **Difference in Labor Costs** |
| Missouri | $901,689.84 | $850,779.36 | $(50,910.48) |
| Tennessee | $550,344.48 | $627,596.86 | $77,252.38 |
| Arkansas | $508,674.87 | $824,606.66 | $315,931.79 |
| **Net Difference in Labor Costs** | | | **$342,273.69** |

F. **The Dispute**

Axiom claims that, under the LOSS PAYMENT section of the Property Coverage Part, Selective still owes it approximately $600,000 for the labor costs Axiom incurred in repairing the damaged equipment, despite the fact that Selective's payout for excess wages under the Extra Expense provision took the $600,000 in repair-related labor costs into account. Axiom notes that "Axiom's labor was not performing its normal labor function of offset printing and support services but was being utilized for the unique purpose of repairing the printing presses to get the Missouri Location back up and running." Axiom believes that it is entitled to recover "normal market rates just as if it had retained a third-party vendor" to complete the repairs. An outside vendor estimated that the repairs would cost around $2.1 million, and Axiom insists that, by urging Axiom to complete the repairs, Selective gained a windfall of at least $1.5 million, while Axiom, in contrast, sustained opportunity costs in devoting its Missouri labor to repairs. Among the opportunity costs that Axiom alludes to are the performance of "other maintenance," mandating the use of paid vacation time, and shifting labor to the other locations to reduce overtime or increase production. However, Axiom has not presented any evidence concerning the specific

7

types of maintenance the labor force otherwise could have performed or specific lost business opportunities it otherwise could have pursued.

Selective contends that the labor costs for the repairs have been paid in full under the Extra Expense provision of the Income Coverage Part.

Axiom initiated suit to recover the $600,000 it contends it is owed for the repairs, asserting claims for breach of contract, unjust enrichment, promissory estoppel, and vexatious refusal to pay. Selective has moved for summary judgment on all four counts.

## II. Legal Standard

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Higgins*, 931 F.3d at 669 (quotation marks and citation omitted); Fed. R. Civ. P. 56(a). While the moving party bears the burden of establishing a lack of any genuine issues of material fact, *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010), the party opposing summary judgment "must set forth specific facts showing that there is a genuine issue of material fact for trial." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Gibson v. Concrete Equip. Co.*, 960 F.3d 1057, 1062 (8th Cir. 2020) (holding that summary judgment should be granted only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law).

### III. Discussion

#### A. Breach of Contract

Interpretation of an insurance policy is a matter of state law. *Johnson v. Safeco Ins. Co. of Ill.*, 983 F.3d 323, 329 (8th Cir. 2020). The parties agree that Missouri law governs their dispute.

Under Missouri law, "[t]he exercise of interpreting an insurance policy requires that [the Court] ascertain the intention of the parties and give effect to that intention. The intention of the parties is presumptively expressed by the plain and ordinary meaning of the policy's provisions . . . ." *Id.* (quoting *Gohagan v. Cincinnati Ins. Co.*, 809 F.3d 1012, 1015 (8th Cir. 2016)). If the language of a policy is clear and unambiguous, the Court must enforce it as written. *Seaton v. Shelter Mut. Ins. Co.*, 574 S.W.3d 245, 247 (Mo. banc 2019).

In this case, two types of coverage are at issue. First, the LOSS PAYMENT provision in the Property Coverage Part provides as follows:

> In the event of loss covered by this coverage form, "we" have the following options:
> a. Pay the value of the lost or damaged property;
> b. Pay the cost of repairing or replacing the lost or damaged property;
> c. Rebuild, repair, or replace the property with other property of equivalent kind and quality, to the extent practicable, within a reasonable time; or
> d. Take all or any part of the property at the agreed or appraised value.

Second, under the Income Coverage Part, Axiom is entitled to, *inter alia*, extra expenses incurred to "continue operating at a . . . replacement location" and to "repair, replace, or restore any property" insofar as the expenses "would not have been incurred "if there had been no physical loss or damage . . . ."

Axiom insists that it is entitled to an additional $600,000 more than Selective has already paid it because it has not been compensated for the labor directly related to the repairs. Selective's position is that it has fully compensated Axiom for the "the cost of repairing or replacing the lost or damaged property" because those costs were reflected in the $342,273.69 in excess wages that

9

Selective has already paid to Axiom.  Selective argues that, under the HOW MUCH WE PAY PROVISION, Axiom cannot recover more than Selective already has paid.

As an initial matter, Axiom's claim that it is entitled to be compensated for the $600,000 in repair-related labor costs under *both* the Extra Expense and Property Coverage provisions is barred by the plain language of the HOW MUCH WE PAY provision.  That provision states: "If more than one coverage of this policy insures the same loss, 'we' pay no more than the actual claim, loss, or damage sustained."  Doc. 35-2, at 104.  This language precludes Axiom from recovering twice for one loss, even if that loss is covered under more than one provision.  Thus, Axiom can recover, at most, $600,000 for the repair-related labor costs.

The next question before the Court is whether Axiom would have been entitled to more money from Selective if Selective had paid the $600,000 in repair-related labor costs under the Property Coverage Part.  The Court finds that it would not because, if Selective had paid Axiom for the repair costs under the Property Coverage Part, then Selective's payout for Axiom's excess labor costs under the Extra Expense provision correspondingly would have decreased.  That is, if Selective paid Axiom $600,000 under the LOSS PAYMENT provision of the Property Coverage Part, then, rather than having $850,779.36 in labor costs in Missouri during the loss period, Axiom would only have $250,779.36 in Missouri labor costs because the $600,000 expense could not be credited to Axiom twice.  In this scenario, as set forth in the chart below, the shortfall in Missouri labor costs would exceed the extra labor costs in Arkansas and Tennessee by $257,726.31:

| Axiom's Excess Labor Costs at Each Location Assuming Payout Under LOSS PAYMENT provision |||| 
|---|---|---|---|
| Axiom Facility | Projected Labor Costs (Without Loss) | Actual Labor Costs (With Loss) | Difference in Labor Costs |
| Missouri | $901,689.84 | $250,779.36 | -$650,910.48 |
| Tennessee | $550,344.48 | $627,596.86 | $77,252.38 |
| Arkansas | $508,674.87 | $824,606.66 | $315,931.79 |
| Net Difference in Labor Costs | | | $257,726.31 |

In this scenario, Axiom would have to refund some of Selective's Extra Expense payment because a payment for repair-related labor under the LOSS PAYMENT provision of the Property Coverage Part would require a reduction in the payment for wages under the Extra Expense provision. The charts below break the figures down:

**Certain Payouts to Date (with $600,000 Under Extra Expense Provision)[3]**

| | |
|---|---|
| Property Coverage Part | $2,564,562.34 |
| Income Part (Extra Expense Provision) | $728,827.48 |
| incl. Extra Expense Provision – Wages ($342,273.69) | |
| TOTAL | $3,293,389.82 |

**Certain Payouts with $600,000 Under Property Coverage Part Only**
(with altered figures in bold)

| | |
|---|---|
| Property Coverage Part | **$3,164,562.34** |
| incl. Wages for Repairs (**$600,000.00**) | |
| Income Part (Extra Expense provision) | **$128,827.48** |
| incl. Extra Expense Provision – Wages (**-$257,726.31**) | |
| TOTAL | $3,293,389.82 |

**Difference between Payouts to Date and Theoretical Payout with $600,000 Under Property Coverage Part: $0.00**

---

[3] Figures from Doc. 35-7. For clarity, amounts paid under Buildings Provision and Business Income Provision, which would not change under any of these scenarios, have been excluded.

11

The calculations show that whether Selective paid Axiom's repair-related labor costs under the LOSS PAYMENT provision in the Property Coverage Part or the Extra Expense provision in the Income Coverage Part, the payment to Axiom would not change.[4]

### B. Vexatious Refusal to Pay

To succeed on its claim for vexatious refusal to pay, Axiom must establish (1) that it had an insurance policy with Selective, (2) that Selective refused to pay a covered claim, and (3) that Selective's refusal was without reasonable cause or excuse. *Hensley v. Shelter Mut. Ins. Co.*, 210 S.W.3d 455, 464 (Mo. Ct. App. 2007). As discussed above, Axiom has failed to establish that Selective refused to pay a covered claim. Therefore, Axiom cannot prevail on its claim for vexatious refusal to pay.

### C. Unjust Enrichment and Promissory Estoppel

Axiom's equitable claims fare no better. As a preliminary matter, under Missouri law, a plaintiff may not maintain an action for quasi-contract remedies, such as unjust enrichment and promissory estoppel, when an express contract governs the subject matter for which recovery is sought. *32nd Street Surgery Center v. Right Choice Managed Care*, 820 F.3d 950, 955-56 (8th Cir. 2016). As discussed above, the Policy governs the parties' dispute as to whether Axiom is entitled to $600,000 more for the repair-related labor. Axiom's quasi-contract claims therefore are barred as a matter of law. *See, e.g.*, *Lowe v. Hill*, 430 S.W.3d 346, 349 (Mo. Ct. App. 2014) ("[A] plaintiff cannot recover under an equitable theory when she has entered into an express contract for the very subject matter for which she seeks to recover.").

---

[4] The calculation assumes that, if Axiom's repair-related labor costs were paid under the LOSS PAYMENT provision of the Property Coverage Part, its covered Extra Expenses would be offset by its wage savings, as the parties have not suggested otherwise.

Axiom argues that this is an "extreme" case in which a quasi-contract remedy should apply to "avoid unjust results." *Williams v. Medalist Golf, Inc.*, 910 F.3d 1041, 1047 (8th Cir. 2018) (applying Missouri law). A plaintiff who "can point to evidence which, if believed, would permit a judge or jury to find each of the[] elements, is entitled to go to trial without prior judicial determination as to whether the case is 'extreme.'" *Midwest Energy, Inc. v. Orion Food Sys., Inc.*, 14 S.W.3d 154, 158-59 (Mo. Ct. App. 2000).

Here, however, Axiom has not presented evidence sufficient to establish each element of its quasi-contract claims. To prevail on a claim of promissory estoppel, "a party must establish the following elements . . . : (1) a promise; (2) promisee detrimentally relies on the promise; (3) promisor could reasonably foresee the precise action the promisee took in reliance; and (4) injustice can only be avoided by the enforcement of the promise." *Williams*, 910 F.3d at 1047.

Even construing the evidence in the light most favorable to Axiom, Selective promised only that it would reimburse Axiom for labor costs directly related to the repairs, and as discussed above, there is no indication that Selective failed to do as promised. There was no promise by Selective as to whether Axiom would be able to collect payouts for excess wages separate from, or on top of, a payout for repair costs. None of the evidence suggests that Selective represented to Axiom that it would pay $600,000 to Axiom without deducting that amount from its calculation of wages payable under the Extra Expense provision. Indeed, Mr. Duffield said that he did not recall going into specifics regarding the "different buckets of costs associated with the claim" in that meeting. He explained, "I knew it was going to be a difficult time and didn't want to lose customers because I didn't have the capacity to do so. So I wasn't as concerned about which bucket was going to be charged." Mr. Hendrix had a similar recollection. *See* Doc. 36-4, Hendrix Depo. Tr. 31:18-3 (Q. And it's fair to say that you don't remember any discussion about timing of

13

payment when you met with Mr. Howell in the conference room on September -- on February 20th, 2019? A. What I remember about that was Chris talking about a need of cash immediately and Heath making a comment about, you know, getting an initial payment. And it wasn't -- it wasn't in a particular bucket of labor, parts, services, or anything like that. It was just cash needed to operate the business."). In short, there is no evidence that Selective made a promise that it failed to keep. Therefore, the claim for promissory estoppel cannot survive summary judgment.

The claim for unjust enrichment fails for similar reasons. To succeed on a claim of unjust enrichment, Axiom must show: "(1) [that] the defendant was enriched by the receipt of a benefit; (2) that the enrichment was at the expense of the plaintiff; and (3) that it would be unjust to allow the defendant to retain the benefit." *Roberts v. Roberts*, 580 S.W.3d 600, 605 (Mo. Ct. App. 2019) (quotation marks and citation omitted).

Axiom CEO Mr. Duffield testified that he suggested using Axiom's Missouri labor force to repair the damaged equipment because he feared they would "not be able to find enough labor in the country, in the US, to get them here in time to get this equipment fixed, and it will -- so it will delay and cost a significant amount more." He feared that, if the repairs took too long, Axiom would lose customers. Thus, undertaking the repairs using the Missouri labor force was to Axiom's benefit as well, not just Selective's.

More fundamentally, Axiom was compensated for the labor it devoted to the repairs, consistent with the Policy.

In short, there is no evidence suggesting that Selective's failure to pay more money to Axiom for the repair efforts was at Axiom's expense. Axiom's claim for unjust enrichment thus cannot survive summary judgment.

14

## IV.    Conclusion

For the reasons discussed above, Selective's motion for summary judgment is GRANTED. Selective is entitled to judgment in its favor on each count brought by Axiom.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  August 2, 2021
Jefferson City, Missouri